**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JOYCE M. ROBINSON,**

    **Plaintiff,**

    v.

                                         Civil Action 2:13-cv-530
                                         Judge Edmund A. Sargus, Jr.
                                         Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**REPORT AND RECOMMENDATION**

    Plaintiff, Joyce M. Robinson, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 21), Plaintiff's Reply (ECF No. 22), and the administrative record. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

        **I.**        **BACKGROUND**

    Plaintiff filed applications for DIB and SSI in June 2009, alleging that she became disabled in April 2009, at age 50, due a number of physical issues. After Plaintiff's claims were denied initially and upon reconsideration, she requested a hearing before an administrative law judge.

On February 7, 2012, Administrative Law Judge John Montgomery ("ALJ") held a hearing at which Plaintiff, represented by counsel, appeared and testified. (R. at 239–90.) Vocational Expert Michael Klein ("VE") also appeared and testified. On June 8, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 11–24.) On April 5, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 6–8.) Plaintiff then timely commenced the instant action.

## II.     HEARING TESTIMONY

**A.     Plaintiff's Testimony**

Plaintiff testified that she lives with her sister and husband and that she does not have a drivers' license. She indicated that her family drives her around or that she uses public transportation. Plaintiff reported that although she graduated from high school, she still struggles with reading and writing. She stated that she believes she can no longer work because she has difficulty breathing and following directions and also because she is physically "too slow," which she attributes to problems with her legs and rheumatoid arthritis in her hands. (R. at 248.) She also stated that she has pain in her elbows, that she can only walk from her front room to her bathroom, that she can only stand for five or ten minutes at a time, and that she can only lift five or ten pounds. (R. at 252–53.) She indicated that her family helps her with her finances and helped her apply for disability benefits.

Plaintiff testified that she can do housework, including making a bed, cleaning a sink, cooking for herself, and laundry. She bathes and dresses herself, but sometimes experiences difficulty dressing because of the bending involved. She sometimes reads magazines and

newspapers and likes reading story books.  She indicated that she used to take walks to the library and shops, but now needs to hold onto a cart because of her legs.

Plaintiff testified that she worked as a security guard and in that capacity received training, kept records, and carried a firearm.  She said she needed to stop working as a security guard "[b]ecause [her] health started getting bad."  (R. at 246.)  Plaintiff also reported that she worked at a nursing home for approximately a year, but had difficulty reading information to the patients.  She also worked at Ponderosa as a baker.  In that capacity, she mixed ingredients and put them in the oven.  She said that people needed to instruct her as to how many ingredients to put in and that she was told she was too slow.  Plaintiff also worked at Burger King for three years as a cashier, cook, and drive-through worker.  She testified that she had difficulty at the cash register and worked too slowly at the cook's job.

**B.     Barbara Perry's Testimony**

Plaintiff's sister, Barbara Perry, testified that Plaintiff was a slow learner and would need to be told something multiple times before she learned it.  She indicated that growing up, Plaintiff could keep herself clean and make a sandwich, but that she needed help wither her homework.  Ms. Perry described Plaintiff as "gullible."  (R. at 269.)  She reported that Plaintiff had been married and raised three children, but that her children do not assist her anymore.  She indicated that Plaintiff had her children taken from her at some point because she allowed them to spend time with a relative who was a child molester.

She also indicated that Plaintiff obtained the security job through a friend and that she received assistance performing many of her past jobs.  Ms. Perry testified that Plaintiff could leave her notes, but that she would likely misspell words.  She also reported that if Plaintiff were

given a grocery list, she could get the items on the list, but that she would also buy candy and junk foods. She added that Plaintiff cooks some meals "very well." (R. at 275.)

C.     **Vocational Expert Testimony**

The VE testified that Plaintiff performed her past work at the unskilled level even though some of the jobs would be typically classified as skilled. The ALJ then asked the VE to consider an individual with Plaintiff's age, education, and work experience with the following non-exertional limitations: no reading or writing; requiring only simple, routine job skills; an environment that is not fast-paced, does not have strict production requirements, and involves only superficial interaction with others; and no team-building or consensus building involved. The VE testified that such an individual would not be able to perform Plaintiff's past relevant work because of the limitation of no fast-paced work. According to the VE, however, there would be a significant number of jobs in the regional and national economy she could perform, including checker/weigher at the sedentary level, hand packager and order picker at the medium level, and small product assembly and dining room attendant at the light level. The VE further testified that upon addition of the limitations of no more than light exertion, preclusion from work involving respiratory irritants, and low-stress were added, the individual would still be able to perform the light work jobs he identified. Upon further questioning by Plaintiff's counsel, the VE indicated that competitive employment would be precluded if the individual also worked more slowly than average and were limited to jobs involving one- or two-step instructions, explaining that an unskilled job really requires one, two, and three steps.

### III. EDUCATION RECORDS

Records from Franklin County Schools reflect that Plaintiff graduated from high school, that her IQ was within the "Slow Learner range," and that she attended special education classes full time. (R. at 135.) In high school, she tested at just above a 6th-grade level for math and reading and between a fourth and fifth-grade level for spelling. (*Id.*)

### IV. MEDICAL RECORDS

In her Statement of Errors, Plaintiff does not challenge the Commissioner's finding that she does not have any severe physical impairments and that her allegations to the contrary are not credible. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged non-exertional impairments.

**A.     Lari Meyer, Ph.D.**

In October 2010, psychologist Lari Meyer, Ph.D., evaluated Plaintiff. Plaintiff first endorsed experiencing depression when she was 18. Plaintiff, however later contradicted this indication and stated that her symptoms of depression did not begin until she was in her 30's or 40's, when she experienced symptoms everyday for two or three hours per day. (R. at 164–65.) She reported that she was not currently being treated for depression and that she had no recollection of ever being treated for depression. Plaintiff indicated that she worked in a factory for eight years and also in a restaurant at various positions and as a security guard. She indicated that she had been fired from several jobs due to her inability to concentrate and her depression. She stated that she tried to exercise, that she completed house work, that she took turns cooking, that she does not drive, and that she bathes/changes clothes every other day. Plaintiff endorsed crying spells a "couple days a week." (R. at 169.) Dr. Meyer described Plaintiff's dress as

5

appropriate, her grooming as adequate, her behavioral presentation as within the normal range, and her social presentation as "somewhat unsophisticated." (R. at 168.) She further described Plaintiff's speech, mood, and affect as normal and her insight and judgment as adequate.

Upon testing, Plaintiff attained a verbal comprehension index of 61, a perceptual reasoning index of 71, and a full-scale IQ of 61, which Dr. Meyer presumed to be valid. Dr. Meyer explained that she diagnosed Borderline Intellectual Functioning because "there is no evidence provided of pre-age 18 IQ score below 70." Dr. Meyers emphasized that the diagnosis "should be ruled out if there is additional information regarding pre-age 18 IQ score below 70." (R. at 172.) Dr. Meyer also diagnosed Plaintiff with a reading disorder based upon her reports of difficulty reading and her performance during testing. Finally, Dr. Meyer diagnosed Plaintiff with depressive disorder not otherwise specified based upon Plaintiff's reports of experiencing symptoms of depression. She opined that Plaintiff would experience mild-to-moderate impairment in her ability to understand, remember, and follow instructions, depending upon the demands placed upon her; mild impairment in her ability to maintain attention, concentration, persistence, and pace; moderate impairment in her ability to relate to others due, in part, to her alleged depressive symptoms; and mild-to-moderate impairment in her ability to withstand the stress and pressures associated with work, depending on whether the environment was high or low stress.

**B.     Mel Zwissler, Ph.D.**

On October 28, 2010, reviewing psychologist Mel Zwissler, Ph.D., opined that Plaintiff's mental impairments caused mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace and

found no episodes of decompensation of extended duration. (R. at 177–84.) He concluded that she did not satisfy the criteria of Listings 12.04 or 12.05. In the functional capacity section of his assessment, Dr. Zwissler found that Plaintiff was partially credible and concluded that she "retains the capacity to perform three step tasks in a routine environment that requires only superficial interactions with others." (R. at 184.)

C.    **Appleseed Community Health**

In June 2011, Plaintiff presented at Appleseed Community Health for a mental diagnostic assessment. The counselor described Plaintiff as well groomed, pleasant, and of low-average intelligence. (R. at 204.) Based upon Plaintiff's reports, the counselor diagnosed her with dysthymic disorder. (R. at 205.)

## V.    THE ADMINISTRATIVE DECISION

On June 8, 2012, the ALJ issued his decision. (R. at 9-11.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial

---

[1]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

gainful activity since April 10, 2009, her alleged onset date.  (R. at 16.)  The ALJ found that Plaintiff's severe impairments included borderline intellectual functioning, depressive disorder, and reading disorder.  He relied upon the conclusions of Drs. Klyop, McCloud, and Padamadan, to conclude that Plaintiff does not have any severe physical impairments and that her allegations to the contrary are not credible.  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> The claimant has the residual functional capacity to perform a full range of work at all exertional levels, but, from a mental standpoint, she is limited to simple, routine tasks in a non fast-paced work setting without strict production quotas, more than superficial interaction with others, or required reading and writing as part of the job.

(R. at 20.)  The ALJ relied upon the VE's testimony to conclude that given her RFC, she could not perform her past relevant work but that jobs exist in significant numbers in the regional and national economy that she could perform.

## VI.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

8

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ's committed a number of errors in assessing whether her cognitive impairments met or equaled Listing 12.05(C). More specifically, she submits that the ALJ committed the following five errors: (1) "[t]he decision violated the language of the listing and case law by requiring an IQ score or a diagnosis of mental retardation before age 22"; (2) "[t]he decision erred in evaluating deficits in adaptive functioning by considering areas of non-deficit instead of areas of deficit, evaluating claimant's

overall level of adaptive functioning, and failing to find whether there were deficits in two areas as required"; (3) "[t]he decision erred by requiring the deficits in adaptive functioning to be significantly disabling by themselves, rather than be the intended diagnostic indicators accompanying a low IQ score"; (4) "[t]he decision violated case law by finding that ordinary activities are inconsistent with mental retardation, even though individuals with IQ 60-70 and adaptive deficits can perform them—working, reading and writing, marrying, having children"; and (5) "[t]he decision violated the text of the listing (requiring that the lowest of verbal, performance, and full-scale scores be used) and case law by requiring that there be a diagnosis of 'mild mental retardation' instead of borderline intellectual functioning." (Pl.'s Statement of Errors 1, ECF No. 12.)  Plaintiff seeks remand or reversal with a holding that Plaintiff meets Listing 12.05(C).

     A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process.  20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Hum. Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  It is not sufficient to come to close to meeting the conditions of a Listing.  *See, e.g.*,

10

*Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Listing 12.05 covers impairments related to intellectual disability.[2]  Specifically, Listing 12.05 states:

> [Mental retardation] refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*     \*     \*
>
> C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. 404, Subpt. P, App. 1 § 12.05.  Thus, in order to satisfy Listing 12.05(C), a claimant must demonstrate the following:

> (1) he [or she] experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period" (i.e., the diagnostic description); (2) he [or she] has a "valid verbal, performance, or full scale IQ of 60 through 70"; and (3) he [or she] suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

*West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697-98 (6th Cir. 2007) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C)).  To satisfy the diagnostic description, a claimant must demonstrate three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations."  *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675

---

[2]In August 2013, the term "mental retardation" was replaced with "intellectual disability."  To avoid any confusion with the ALJ's decision and the parties' briefing, the Court will use the term "mental retardation."

(6th Cir. 2009). A claimant may meet the onset requirement either directly or circumstantially.

In this case, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of Listing 12.05(C). More specifically, he concluded that Plaintiff did not satisfy her burden to prove that she had significantly subaverage mental functioning that manifested itself prior to age twenty-two and also failed to demonstrate the requisite deficits in adaptive functioning. The ALJ reasoned, in part, as follows:

> Although the claimant attained IQ scores below 70 in October 2010 . . ., there is no evidence of a pre-age 22 IQ score below 70 and her actual level of adaptive functioning is inconsistent with the requirements of Listing 12.05C, which addresses mental retardation. Her scholastic record indicated that she had an IQ in the slow learner range . . ., which does not reasonably translate into an assessment of mental retardation. Rather, her reading and math abilities placed above the sixth-grade level, and Dr. Meyer diagnosed borderline intellectual functioning rather than mental retardation. In any event, evidence of adult mental retardation would not be dispositive absent evidence of significantly subaverage mental functioning or deficits of adaptive functioning prior to age 22 . . . .
>
> With respect to the claimant's actual functioning, she has reported a history of work activity, including as a dietary aide, security officer, packager, fast food worker, baker, and cashier . . . . At the hearing, it was argued that she received special assistance with her past work and was hired at some jobs due to [] personal contacts rather than ability, but no documentation was submitted to substantiate such claims. She reported that she could read and write . . . ., and she thoroughly completed her own disability forms . . . . She married and raised several children. In conclusion, her actual level of functioning is inconsistent with a diagnosis of mental retardation.

(R. at 18 (internal citations omitted).)

The Undersigned finds that the ALJ reasonably concluded that Plaintiff's mental impairment failed to meet or satisfy Listing 12.05(C). Indeed, Dr. Zwissler, who reviewed the entire record, explicitly concluded that Plaintiff did not satisfy the criteria of Listing 12.05. (R. at 184.) Plaintiff's arguments to the contrary are unavailing because they rest upon faulty

premises and improperly seek to shift the burden to the ALJ to disprove that she did not satisfy the Listing. The Undersigned now addresses each of Plaintiff's contentions of error, turning first to her first and fifth contentions of error before addressing the remaining arguments, all of which relate to the ALJ's consideration of her adaptive functioning.

**A.      Pre-Age 22 IQ Score and Diagnosis Borderline Intellectual Functioning**

Plaintiff's first and fifth assertions of error fail to persuade because they are premised upon an inaccurate characterizations of the ALJ's decision. In her first contention of error, Plaintiff submits that the ALJ erroneously required an IQ score or diagnosis of mental retardation before age 22. Certainly, the absence of a qualifying IQ score during the developmental period is not fatal to a Listing 12.05(C) inquiry. *See West*, 240 F. App'x at 699 ("While the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22."). Here, however, contrary to Plaintiff's assertion, the ALJ did not state that pre-age 22 IQ scores or a diagnosis of mental retardation was dispositive to his Listing 12.05(C) analysis. Rather, the above-quoted language from his decision reflects that the ALJ noted the absence of a pre-age 22 IQ score or diagnosis along with other evidence of Plaintiff's intellectual and adaptive functioning within the context of his assessment of whether she manifested the requisite deficits during the developmental period.

Plaintiff similarly mischaracterizes the ALJ's decision in her fifth statement of error, where she posits that the ALJ erroneously required a diagnosis of mild mental retardation instead of borderline intellectual functioning ("BIF"). Plaintiff correctly points out that a diagnosis of

13

BIF "does not rule out the possibility of a finding of mental retardation" under Listing 12.05(C) *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). But the ALJ did not impose such a requirement. Rather, after finding that BIF was one of Plaintiff's severe impairments, he properly proceeded to analyze whether her impairments met or equaled Listing 12.05(C). Within this analysis, the ALJ noted that the consultative psychologist, Dr. Meyer, had diagnosed Plaintiff with BIF rather than mental retardation. The ALJ did not err in his consideration of Dr. Meyer's BIF diagnosis. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (finding the absence of any mental retardation diagnosis to be a relevant consideration); *West*, 240 F. App'x at 698 (same). Plaintiff's additional contention within this statement of error, namely that the ALJ erred in relying upon Dr. Meyer's diagnosis because it was flawed given that Dr. Meyer did not indicate that she had reviewed the school records and appears to require a qualifying IQ score, is likewise unpersuasive. First, Dr. Meyer did not state that a qualifying IQ during the developmental period was required for a diagnosis of mental retardation; rather, she was explaining that in the absence of such a score (and any other evidence) she declined to make such a diagnoses. Second, reviewing psychologist Dr. Zwissler reviewed the school records, and, like Dr. Meyer, diagnosed BIF instead of mental retardation.

Even if, however, the ALJ committed either of the errors Plaintiff outlines in her first and fifth contentions of error, any such error would be harmless so long as substantial evidence supports his finding that Plaintiff failed to demonstrate the requisite deficits in adaptive functioning. *See West*, 240 F. App'x at 698 (affirming ALJ's decision, even though he mistakenly implied that Listing 12.05(C) required a qualifying IQ score before the age of 22 because the claimant failed to produce evidence of deficiencies in adaptive functioning and

14

medical evidence supported the ALJ's conclusion).  Accordingly, the Undersigned now turns to Plaintiff's second, third, and fourth contentions of error, all of which challenge the ALJ's findings regarding the deficits-in-adaptive-functioning requirement of Listing 12.05(C).

### B.     Deficits in Adaptive Functioning

In Plaintiff's second through fourth contentions of error, she maintains that the ALJ erred in evaluating her adaptive functioning in a number of ways, including considering her overall adaptive functioning rather than focusing on areas of deficit, requiring the deficits to be disabling, and considering ordinary activities to be inconsistent with mental retardation.

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 F. App'x at 677.  Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Further, in considering Listing 12.05, the Sixth Circuit has noted that "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting DSM-IV-TR at 49).

The plain language of Listing 12.05 does not identify how severe limitations must be to qualify as "deficits in adaptive functioning." *Pendleton v. Comm'r of Soc. Sec.*, No.

15

1:10–cv–650, 2011 WL 7070519, at *11 (S.D. Ohio Dec. 23, 2011).  Nevertheless, case law from the Sixth Circuit and other federal courts, suggests that a claimant must have relatively significant deficits to satisfy the Listing.  *See, e.g.*, *West*, 240 F. App'x at 698–99 (suggesting that a claimant's ability to understand and retain simple instructions; maintain concentration and attention for basic tasks; interact effectively with co-workers; and deal with work stress all supported a finding of no deficiencies in adaptive functioning); *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815–16 (11th Cir. 2009) (claimant who did well in special education classes; was able to perform several jobs; and who had mild limitations in daily living activities, social functioning, and concentration did not have the type of deficits in adaptive functioning required for Listing 12.05(C)); *McMillan v. Comm'r of Soc. Sec.*, No. 1:10–cv–00308, 2012 WL 90264, at *6 (W.D. Mich Jan. 11, 2012) (holding that insignificant or trivial deficits were not sufficient to satisfy Listing 12.05 and ALJ's finding of moderate restrictions in daily living did not require a finding of deficits in adaptive functioning).

In this case, contrary to Plaintiff's assertion, the ALJ did not improperly focus only on the areas in which she did not display deficits.  Instead, he considered all of the record evidence, including her school records, her past work history, her daily activities, her family history, the medical evidence, the competency with which she completed her disability forms, and Plaintiff and her sister's testimony at the hearing.  Significantly, the ALJ found Plaintiff's testimony regarding her limitations to be only partially credible, a finding that she does not challenge and that is undeniably supported by substantial evidence.

Nor did the ALJ require her deficits to be disabling.  Rather, the ALJ ultimately agreed with Drs. Zwissler and Meyer that Plaintiff had only mild or moderate deficits in adaptive

16

functioning and concluded that these deficits were not sufficient to satisfy the diagnostic criteria of Listing 12.05.  (*See* R. at 174–75, 180–84, and 19–22.)  With regard to her capacity to work, the ALJ agreed with Dr. Zwissler that Plaintiff has the ability to understand and perform simple, routine tasks in a restricted environment that requires only superficial interactions with others. (*See* R. at 174–75, 180–84, and 19–22.)

Finally, the ALJ did not err in considering Plaintiff's work, marriage, and family history, among other indicators of her functioning, in evaluating her adaptive functioning.  *See*, *e.g.*, *Justice v. Comm'r*, 515 F. App'x 583, 587 (6th Cir. 2013) (substantial evidence supported ALJ's "conclusion that [claimant] did not display requisite deficits in adaptive functioning initially manifested during the developmental period" where claimant had lengthy work history, was enrolled in special education classes until he dropped out in the ninth or tenth grade, the medical reports supported the less severe diagnoses of BIF rather than mental retardation, and evidence supported the conclusion that he was able to adequately manage his activities of daily living).

## VIII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**


Date:  July 10, 2014                                  /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge

18